IN THE NEBRASKA COURT OF APPEALS

MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)

FROST V. MONAHAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

JOEL B. FROST, APPELLEE,

V.

STACIE L. MONAHAN, NOW KNOWN AS STACIE L. DEMATEO, APPELLANT.

Filed April 7, 2020.    No. A-18-1081.

Appeal from the District Court for Richardson County: JULIE D. SMITH, Judge. Affirmed.

Laura A. Lowe, P.C., for appellant.

Diane L. Merwin, of Fankhauser, Nelsen, Werts, Ziskey & Merwin, P.C., L.L.O., for appellee.

MOORE, Chief Judge, and PIRTLE and WELCH, Judges.

PIRTLE, Judge.

## I. INTRODUCTION

This is an appeal from an order of modification entered by the district court for Richardson County. For the reasons stated below, we affirm the district court.

## II. BACKGROUND

Joel B. Frost and Stacie L. Monahan (now known as Stacie L. DeMateo) are the parents of Owen, born in April 2015. Joel and Stacie were never married but they lived together before the child was born and until January 9, 2016. When the relationship between the parents ended Joel filed a complaint for paternity, custody, and child support. The parents entered into a stipulated parenting plan on November 21, 2016, and waived a hearing on the complaint filed by Joel. The district court adopted the stipulated parenting plan on November 28, 2016, and found Joel to be

- 1 -

Owen's biological father. The court ordered joint legal custody, and joint physical custody of Owen until he started school. Stacie was ordered to pay $138 per month in child support.

The stipulated parenting plan called for "week on/week off" parenting time switching at 4 p.m. on Sundays until Owen reached school age. After Owen started kindergarten, Stacie would have primary custody, and Joel would have parenting time every other weekend, during school vacations, and in the summer. Parenting time exchanges were made halfway between the homes of the parents, in Nebraska City. According to Joel, this arrangement was agreed upon at the time because the plan was to enroll Owen in the Norris school district so he could take advantage of the "FFA" programs in preparation for life on the family farm in Richardson County. This educational plan would require some pre-planning on Stacie's part since she did not live in the Norris school district at the time of the original order. And by 2018 she had not made any efforts to relocate to the Norris district or to place Owen on the kindergarten waiting list which was required for kids living outside the district. The Norris kindergarten waiting list was "one to two years" by 2018 and Owen was already three years old.

At the time the parenting plan was adopted, Joel was living in Falls City. He owned and operated a machinery and welding business and anticipated assuming responsibility for his family's farm in the future. Stacie was living in Lincoln and working for a government contractor charged with enrolling providers for Nebraska Medicaid.

In October 2017 Joel married Angela Frost and they have a daughter together. Angela is a stay at home mom. Joel, Angela, and their children live in a fully renovated four-bedroom farmhouse on six acres outside of Falls City, Nebraska. When Joel has parenting time Owen goes with him on service calls, they fish together, and fix fences. Owen enjoys entertaining his half-sister and baking with Angela. Owen attends a preschool in Falls City during the weeks he is staying with Joel. Angela and Joel both testified they were aware Owen has had an occasional temper tantrum at preschool and his defiant behaviors have been "getting worse since he was two, two-and-a-half years old." Angela testified she has observed Joel try to co-parent with Stacie but Stacie "turns him down" and denies similar defiant behaviors during her parenting time. Angela's efforts to communicate with Stacie about Owen's health have been met with "stop texting me."

At his father's house Owen has his own bedroom, a play room, a sandbox, an outdoor playground, a paved area to ride his bike, and he is exposed to numerous farm animals and dogs. All of the animals are outside animals and they never travel inside a vehicle with Owen because Owen has had numerous respiratory ailments and has allergies caused by dogs, cats, dust, and mold.

Joel has extended family on both his mother and father's sides in the Falls City area. Stacie's mother lives in Falls City and Stacie has a brother in Lincoln. Stacie's father and a grandmother live in St. Joseph, Missouri.

Since the parties have not made the necessary arrangements for Owen to attend the Norris Public Schools, Joel believes Owen should go to school in Falls City. Both Joel and Stacie graduated from high school there and Joel is aware of an expanding FFA program in Falls City which is supported by the agricultural community. Joel expects to take over his family's farm when his father retires and the farm will eventually pass to Owen. Owen is already involved in 4-H in Falls City.

Stacie married Richard DeMateo in June 2018 after dating for a year-and-a-half. Richard was deployed with the military for a year during that time but he has returned to Lansing, Kansas, where he is a sergeant on the police force. Stacie wants to move to Kansas with Owen in order to take advantage of a better employment opportunity and to be able to live with Richard. Richard shares custody of his two children with his former wife and they are in his home three or four days every week. Richard's daughter was five, and his son was four years old at the time of trial. Richard's children will attend school in Lansing, Kansas, which is a very safe town according to crime statistics. Richard is aware of many activities for children in Lansing, either through the school or the library. The Lansing schools do not have an FFA program.

When Owen is with his mother in Lincoln, he has his own room in her two-bedroom apartment. Owen attends La Petite preschool in Lincoln and he goes there "almost every day" when Stacie has parenting time. Stacie believes it is important for Owen to be in preschool, rather than at home, in order to begin his formal education, and learn to adapt to a routine. Stacie also believes it is important to be in preschool in order to become appropriately socialized and learn to interact with other kids.

Owen has traveled with his mother to Richard's house "a handful of times for a day and a half at a time" and he has met Richard's children. Stacie has investigated preschools in Lansing and has identified one within walking distance of Richard's house. Richard's house has two bedrooms and two bathrooms and a smaller room which is being converted into a bedroom. Richard's house is in a residential neighborhood and he has an inside dog.

Cooperation between Joel and Stacie has become challenging under the terms of the original parenting plan. The original parenting plan required the parents to cooperate in meeting Owen's medical needs and Joel complains Stacie often fails in this regard since "nine times out ten" Owen is sick when Stacie delivers him to Joel for his parenting time. Joel admits he has scheduled medical appointments with allergists and ear, nose, and throat doctors trying to get to the bottom of Owen's various ailments and that he has failed to tell Stacie in advance. Since Stacie is responsible for carrying the healthcare coverage for Owen she complains she is sometimes blindsided by the bills.

The original parenting plan also requires the parents to give each other "first right of refusal" if the parent with the parenting time is unable to care for Owen for the entire period of his or her time. Joel complains Stacie has left Owen with her father or grandmother when she has needed to travel or wanted a night out instead of letting him have parenting time. Joel testified he never knew whether Owen was in Lincoln or Kansas during the last year unless he logged into the day care records to see if he was in preschool on a given day.

In mid-May 2018, Stacie advised Joel she had been offered a position in Topeka, Kansas, which would pay her roughly $1,100 more in salary per year along with the flexibility to work remotely from home. At this point Joel was aware of Richard but Stacie had not married him yet. On May 21, 2018, Joel filed a motion to modify the original custody and child support order, alleging there had been material changes since the entry of the original order in November 2016, including conflicts between the parents about school enrollment, denying the other parent the first right of refusal for parenting time if a parent was unable to fulfill his or her parenting time, and lack of cooperation between the parents in addressing Owen's medical needs. Joel asked the court

to find that it was in Owen's best interests to place legal and primary physical custody of Owen with him, subject to reasonable parenting time for Stacie. Stacie responded to the motion to modify with an answer and counterclaim seeking an order from the court permitting her to move to Lansing, Kansas, with Owen, "under the same custody and parenting plan" entered on November 28, 2016, with the exception of the Norris School District requirement.

Trial on Joel's motion to modify the parenting plan and Stacie's counterclaim was held October 29, 2018. Both parents testified, as did each of their spouses. On November 9, after finding there had been a material change in circumstances that required changing the custody and parenting time between the parents, the court granted Joel's request for modification by awarding him sole legal custody and awarding him primary physical custody once Owen starts school. At that time, Stacie would have parenting time every other weekend, during school breaks, and during the summer. The court found that Stacie had established a legitimate reason to move to Kansas and granted her permission to move, but did not address whether such move was in Owen's best interests. The court ordered that parenting time would continue to alternate on a "week on/week off" joint physical custody basis as previously ordered until Owen starts kindergarten.

## III. ASSIGNMENTS OF ERROR

Stacie alleges the district court erred in (1) finding that it was in Owen's best interests that Joel be awarded sole legal custody of Owen, (2) finding the original parenting plan should be modified to award Joel primary physical custody of Owen once he starts school, (3) denying Stacie's request that the original parenting plan remain in full force and effect with the exception of allowing her to move to Kansas and eliminating the requirement Owen attend school in the Norris School District, and (4) failing to award Stacie a child support abatement during her parenting time in the summer after Owen starts school.

## IV. STANDARD OF REVIEW

Child custody determinations are matters initially entrusted to the discretion of the trial court, and although reviewed de novo on the record, the trial court's determination will normally be affirmed absent an abuse of discretion. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

An abuse of discretion occurs when a trial court bases its decision upon reasons that are untenable or unreasonable or if its action is clearly against justice or conscience, reason, and evidence. A judicial abuse of discretion requires that the reasons or rulings of the trial court be clearly untenable insofar as they unfairly deprive a litigant of a substantial right and a just result. *Id.*

In child custody cases, where the credible evidence is in conflict on a material issue of fact, the appellate court considers, and may give weight to, the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Id.*

## V. ANALYSIS

### 1. REMOVAL TO KANSAS

We first address Stacie's assignment that the court erred in failing to keep the stipulated parenting plan in full force and effect, with the exception of allowing her to remove Owen to

Kansas and eliminating the provision that Owen attend the Norris School District. She argues that leaving the original parenting plan "as is" in regard to custody, with the exception of allowing her to remove Owen to Kansas, would not have an adverse impact on Joel's relationship with Owen and would be in Owen's best interests. The parenting plan gave the parties joint physical custody until Owen went to kindergarten and at that time, Stacie would have primary custody. However, Stacie now wants to move to Kansas and therefore, the original parenting plan is not feasible without the court giving her permission to remove Owen to Kansas.

Before a custodial parent can remove a child from the state, permission of the court is required, whether or not there is a travel restriction placed on the custodial parent. *Schrag v. Spear, supra*. In order to prevail on a motion to remove a minor child to another jurisdiction, the custodial parent must first satisfy the court that he or she has a legitimate reason for leaving the state. *Id.* After clearing that threshold, the custodial parent must also demonstrate that it is in the child's best interests to continue living with him or her in the new location. *Id.* The paramount consideration is whether the proposed move is in the best interests of the child. *Id.*

The district court found that Stacie had shown legitimate reasons for moving to Kansas and granted her request to move to Kansas. However, the court failed to do a best interests analysis to determine if it would be in Owen's best interests to live with Stacie in Kansas.

### (a) Legitimate Reason for Removal

The district court found that Stacie's legitimate reasons for moving to Kansas included a job opportunity and her recent marriage to Richard. Stacie testified that she was offered a job in Topeka, Kansas, which would pay her about $1,100 more per year, would give her the flexibility to work remotely from home, and provide her with opportunities for advancement. In regard to Richard, he has lived in Lansing, Kansas, for 12 years. He has had a career in law enforcement there and his two children from a prior marriage also live in Lansing. Career advancement and remarriage have commonly been found to be legitimate reasons for a move in removal cases. See *Jack v. Clinton*, 259 Neb. 198, 609 N.W.2d 328 (2000). See, also, *Colling v. Colling*, 20 Neb. App. 98, 818 N.W.2d 637 (2012) (move to reside with custodial parent's new spouse who is employed and resides in another state may constitute legitimate reason for removal). Accordingly, the district court did not err in finding Stacie had legitimate reasons to move to Kansas.

### (b) Best Interests of Child

As previously stated, the district court did not do a best interests analysis in regard to removal. In our de novo review of the record, we analyze the best interests factors below. In determining whether removal to another jurisdiction is in a child's best interests, the court considers each parent's motives for seeking or opposing the move; the potential the move holds for enhancing the quality of the child's life; and the impact such a move will have on contact between the child and the noncustodial parent. *McLaughlin v. McLaughlin*, 264 Neb. 232, 647 N.W.2d 577 (2002).

*(i) Each Parent's Motives*

Stacie's motive in seeking removal is to live with her new husband in Kansas and improve her employment situation. Joel opposes removal because he believes that it would be in Owen's best interests to award him primary custody. There is no indication that either party elected or resisted removal in an effort to frustrate or manipulate the other party. The parties' motives being equal, this factor does not weigh for or against removal.

*(ii) Potential for Enhancing Quality of Life*

In determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the child and the custodial parent, a court should evaluate the following considerations: (1) the emotional, physical, and developmental needs of the child; (2) the child's opinion or preference as to where to live; (3) the extent to which the relocating parent's income or employment will be enhanced; (4) the degree to which housing or living conditions would be improved; (5) the existence of educational advantages; (6) the quality of the relationship between the child and each parent; (7) the strength of the child's ties to the present community and extended family there; (8) the likelihood that allowing or denying the removal would antagonize hostilities between the two parties; and (9) the living conditions and employment opportunities for the custodial parent because the best interests of the child are interwoven with the well-being of the custodial parent. *Speers v. Johns*, 26 Neb. App. 889, 923 N.W.2d 777 (2019). The list of factors to be considered in determining the potential that the removal to another jurisdiction holds for enhancing the quality of life of the parent seeking removal and of the children should not be misconstrued as setting out a hierarchy of factors. *Id.* Depending on the circumstances of a particular case, any one factor or combination of factors may be variously weighted. *Id.*

a. Factors Favoring Removal

Stacie's income would increase slightly with the new job in Kansas, but she could also work remotely from home and would have a greater opportunity for advancement. She and Owen would be living with Richard, and therefore living in a home with two incomes. Also, Richard has a house in Kansas, whereas Stacie and Owen were living in an apartment in Lincoln.

b. Neutral Factors

Both parties have been sharing responsibility for Owen's emotional, physical, and developmental needs since he was born. The parties lived together for a period of time after Owen was born and they have had joint physical custody since November 2016. Owen has had various ailments and allergies and there was some dispute in the evidence as to the medical care he receives in each party's care and the communication between the parties. However, it is apparent that both parties are genuinely concerned about and want to care for Owen's needs. Both parties seem to have quality relationships with Owen and the evidence does not show any issues of concern between Owen and either of the parties' new spouses. At the time of the hearing on the motion to modify Joel had been married for a year and Owen had a good relationship with Joel's wife, Angie. Stacie had been married for five months. By the time of the hearing Owen had been to Kansas five

or six times since December 2017 and was getting acquainted with Richard and his children. Owen is too young to express an opinion as to where he wants to live.

In regard to regular school curriculum, there was no evidence that one location had an educational advantage over the other. Stacie testified that if she stayed in Lincoln she wanted Owen to attend preschool at the same place he was attending daycare. She testified that she had found a daycare and preschool in Lansing that was close to Richard's home. The facilities in Lincoln and Lansing were both accredited.

However, when we consider FFA educational and programming opportunities, the educational advantage factor weighs against removal after Owen starts kindergarten. In the original parenting plan the parties agreed that Owen would attend the Norris School District for several reasons, one of which was because it offered FFA education and programming. The parenting plan further stated that if for some reason one of the parties was no longer in favor of the Norris School District, both parties agreed to take certain factors into account when choosing another school district, which included having FFA education and programming available. The Norris School District is no longer an option if Stacie has primary physical custody and the Kansas school district where Stacie planned to live did not offer FFA education and programming. The Falls City schools did offer such education and programming. Joel testified that the FFA program in Falls City is expanding and supported by the agricultural community. We conclude that the Falls City school system offers the best alternative for Owen. If Owen were to miss out on the FFA education and programming, this could also cause increased hostility between the parties.

### c. Factors Against Removal

The evidence establishes that Owen has extended family in Falls City from both sides of Joel's family. Stacie's mother also lives in Falls City and she has a brother in Lincoln. Owen has no family in Lansing, Kansas. Owen is also involved in 4-H in Falls City and that is where Joel's family farm is located.

### d. Quality of Life Conclusion

In considering the factors above, we conclude that the move would neither enhance nor diminish Owen's quality of life before he starts school. We further conclude however, that once he reaches school age, the quality of life factors weigh against removal.

### (iii) Impact on Noncustodial Parent's Contact With Child

The third factor in the best interests determination is the impact of the move on the contact between the child and the noncustodial parent, when viewed in light of reasonable visitation arrangements. *Speers v. John*, 26 Neb. App. 889, 923 N.W.2d 777 (2019). This consideration focuses on the ability of the court to fashion a reasonable visitation schedule that will allow the noncustodial parent to maintain a meaningful parent-child relationship. *Id.* Generally, a reasonable visitation schedule is one that provides a satisfactory basis for preserving and fostering a child's relationship with the noncustodial parent. *Id.* Of course, the frequency and the total number of days of visitation and the distance traveled and expense incurred go into the calculus of determining

reasonableness. *Id.* Indications of the custodial parent's willingness to comply with a modified visitation schedule also have a place in this analysis. *Id.*

The parties have been meeting in Nebraska City for parenting exchanges, which required Stacie to drive about 44 miles from Lincoln, and required Joel to drive about 56 miles from Falls City. If Stacie is allowed to move and the parties have visitation exchanges in Horton, Kansas, Stacie will have to drive about 56 miles and Joel will have to drive about 30 miles. Thus, Stacie's move will actually decrease Joel's travel time. The 30 miles he would have to drive is a reasonable distance and would not negatively impact Joel's access to and contact with Owen. He would be able to have regular parenting time with Owen. The impact on Joel's contact with Owen weighs in favor of removal.

### (iv) Best Interests Conclusion

This case is a close call, but considering all the circumstances of the case, we conclude that the evidence supports granting Stacie's request that she be allowed to take Owen to Kansas before he starts school. The district court did not err in granting her request to move to Kansas.

However, we further conclude that it is not in Owen's best interests to live with Stacie in Kansas after he starts kindergarten. As previously discussed, the FFA education and programming is not available in Lansing, Kansas. Owen's future will likely include agriculture and some type of relationship with the family farm in Falls City. If Owen is living with Stacie in Kansas when he starts school, he will not only miss out on the FFA education and programming, but will also not have the opportunity to work with his father and grandfather on the family farm and learn how the operation works in preparation for potentially owning the family farm.

## 2. MODIFICATION OF CUSTODY

We next address Stacie's assignments of error that the court erred in finding it was in Owen's best interests to modify the parenting plan to award Joel sole legal custody and to award him primary physical custody once Owen starts school.

Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action. *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015). A material change in circumstances means the occurrence of something which, had it been known to the court at the time of the initial decree, would have persuaded the court to decree differently. See *id.*

### (a) Material Change of Circumstances

The party seeking modification of child custody bears the burden of showing a change in circumstances. *Schrag v. Spear, supra.* In determining whether the custody of a minor child should be changed, the evidence of the custodial parent's behavior during the year or so before the hearing on the motion to modify is of more significance than the behavior prior to that time. *Id.*

### (i) Legal Custody

Although Stacie assigned that the district court erred in finding that it was in Owen's best interests to modify legal custody of Owen and award Joel sole legal custody, she has failed to argue this issue in her brief. For an appellate court to consider an alleged error, a party must

specifically assign and argue it. *Furstenfeld v. Pepin*, 23 Neb. App. 155, 869 N.W.2d 353 (2015). Accordingly, Stacie has failed to properly present the issue of legal custody on appeal and we will not address it further.

### (ii) Physical Custody

We next address whether a material change in circumstances existed to warrant modifying physical custody when Owen starts school. The district court found that there was and modified the initial award of primary physical custody of Owen when he starts school from Stacie to Joel. At the time of the stipulated parenting plan, Stacy was living in Lincoln and was not married. Since then, Stacy has taken a job in Topeka, Kansas, and has married Richard who lives and works in Lansing, Kansas. Stacy's new job opportunity, as well as her marriage and desire to move to Kansas is a material change in circumstances.

### (b) Best Interests

Before custody may be modified based upon a material change in circumstances, it must be shown that the modification is in the best interests of the child. *Schrag v. Spear, supra.* Neb. Rev. Stat. § 43-2923(6) (Reissue 2016) provides that in determining custody and parenting arrangements:

[T]he court shall consider the best interests of the minor child, which shall include, but not be limited to, consideration of . . . :

(a) The relationship of the minor child to each parent prior to the commencement of the action or any subsequent hearing;

(b) The desires and wishes of the minor child, if of an age of comprehension but regardless of chronological age, when such desires and wishes are based on sound reasoning;

(c) The general health, welfare, and social behavior of the minor child;

(d) Credible evidence of abuse inflicted on any family or household member; and

(e) Credible evidence of child abuse or neglect or domestic intimate partner abuse.

Other pertinent factors include the moral fitness of the child's parents, including sexual conduct; respective environments offered by each parent; the age, sex, and health of the child and parents; the effect on the child as a result of continuing or disrupting an existing relationship; the attitude and stability of each parent's character; and parental capacity to provide physical care and satisfy educational needs of the child. *Robb v. Robb*, 268 Neb. 694, 687 N.W.2d 195 (2004).

We previously considered similar best interest factors under the removal analysis above and we do not repeat them here. The stipulated parenting plan gave the parties joint physical custody until Owen starts school, and then awarded Stacie primary custody once he started school. As previously discussed, we determine that it is in Owen's best interests to live with Joel in Falls City after he starts kindergarten. Giving deference to the fact that the trial judge heard and observed the witnesses and was in a better position to determine the credibility of the parties, we find no abuse of discretion in the district court's modification and award of primary physical custody to Joel once Owen reaches school age. See *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

### 3. Child Support Abatement

Finally, Stacie assigns the court abused its discretion in failing to order an abatement of her child support obligation when Owen is with her for an extended period in the summer months. After Owen starts school and Joel has primary physical custody, Stacie's parenting time will include his summer break from school, subject to Joel having every other weekend. Stacie argues that based on the time she will have Owen in the summer, the court should have awarded her an abatement for June, July, and August.

Paragraph J of the Nebraska Child Support Guidelines provides that when there are visitation or parenting time periods of 28 days or more in any 90-day period, support payments may be reduced by up to 80 percent, but that such determination is made using the trial court's discretion. *Lucero v. Lucero*, 16 Neb. App. 706, 750 N.W.2d 377 (2008). Although Stacie will undoubtedly incur additional expenses when Owen is with her, Joel's costs in maintaining Owen's permanent home will not disappear. Therefore, we cannot say that the district court abused its discretion in failing to order an abatement of Stacie's child support obligation in the summer months after Owen starts school.

## VI. CONCLUSION

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED.